## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:21-cr-00156 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES GRAHAM | ) | |
| | ) | |
| | ) | JANUARY 2, 2025 |

### MEMORANDUM OF DECISION
### RE: MOTIONS FOR JUDGMENT OF ACQUITTAL (ECF NOs 666, 673, 690)

Kari A. Dooley, United States District Judge:

Following a jury trial, Defendant James Graham ("Graham" or "Defendant") was convicted of obstruction of justice in violation of 18 U.S.C. § 1503. Pending before the Court is Graham's post-trial motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

**Procedural History**

On September 14, 2021, a federal grand jury returned a thirty-six count Indictment against sixteen defendants, including Graham, for conduct related to the activities of the street gang "960" in Waterbury, Connecticut. Graham was charged in Count Twenty-Five with obstruction of justice in violation of 18 U.S.C. § 1503 arising out of the assault of John Aspilaire on or about October 19, 2019.

Graham, along with several other defendants, elected to be tried by a jury. The Court severed the defendants into trial groups, and Graham was tried with codefendants Malik Bayon, Zaekwon McDaniel, and Tahjay Love. *See* ECF No. 489. Tahjay Love was also charged in count Twenty-Five with Obstruction of Justice arising out of the assault of Mr. Aspilaire. Jury selection was held on January 3 and 4, 2024. The jury heard evidence over the course of twenty-three days,

commencing on January 5, 2024, and on February 14, 2024, returned a guilty verdict as to Love

and Graham on Count Twenty-Five. Graham orally moved for Judgment of Acquittal on February

5, 2024, renewed that motion on February 7, 2024, and timely filed the instant written motion on

February 23, 2024, with a memorandum in support on February 28, 2024.[1] *See* ECF Nos. 666,

673; Def.'s Mot., ECF No. 690; Def.'s Mem. in Supp., ECF No. 751. The Government timely filed

its opposition to Graham's motion on May 21, 2024. *See* Gov. Opp'n, ECF No. 952. Graham filed

a reply brief on June 5, 2024. *See* Def.'s Reply, ECF No. 966.

**Standard of Review – Motion for Judgment of Acquittal**

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on

grounds of insufficient evidence if it concludes that no rational trier of fact could have found the

defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the

evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in

the light most favorable to the Government and all permissible inferences drawn in the

Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*,

335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's

verdict may rest entirely on circumstantial evidence." *Id*. "When making a case based on

circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than

that of guilt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v.*

*United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to

---

[1] The arguments that Graham advanced in his oral motion for judgment of acquittal on February 5, 2024, and his renewal of that motion on February 7, 2024, are identical to and encompassed by those advanced in his papers. *See* Feb. 5 Trial Tr., PM, ECF No. 737 at 33:7–37:19; Feb. 7 Trial Tr., ECF No. 740, at 7:6–8:17. In deciding these issues, the Court therefore cites only to Graham's written filings.

choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (citation and internal quotation marks omitted).

With these legal principles in mind, the Court turns to the merits of Graham's motions.

**Discussion**

Graham's primary argument is that 18 U.S.C. § 1503[2], prohibiting obstruction of justice, does not apply in circumstances where the conduct alleged is essentially witness tampering, which, he argues, must be prosecuted under 18 U.S.C. § 1512.[3] *See* Def.'s Mem. in Supp. at 2–3. He relies upon Second Circuit precedent that has so held. The Government responds, asserting first that Graham has waived this argument insofar as he did not raise it before trial. *See* Gov. Opp'n at 2–4. Alternatively, the Government asserts that the Circuit precedents relied upon do not apply to Graham's conduct here—the assault of John Aspilaire. *See id.* at 5. Because the Court agrees that Circuit precedent does not preclude an obstruction of justice charge arising out of an assault of a witness, the Court need not decide whether the issue was raised in a timely fashion or waived.[4]

---

[2] The "omnibus" or "residual" clause of § 1503 provides in pertinent part: "Whoever … corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice," shall be punished.

[3] Section 1512 sets forth a litany of methods and means, which, if employed would constitute the crime of witness tampering.

[4] The Government cites *United States v. Yousef*, 327 F.3d 56, 144 (2d Cir. 2003) and *United States v. Crowley*, 236 F. 3d 104, 110 (2d Cir. 2000) for the proposition that the challenge to the crime charged in the Indictment was untimely and waived. By analogy, these cases support the Government's argument, though they do not provide controlling precedent. And although district courts within the circuit have agreed with the precise waiver argument

Graham alternatively challenges the sufficiency of the evidence, specifically, that there was insufficient evidence that Graham, who was not an alleged member of 960, was aware of the federal investigation into 960; was aware that Aspilaire was a witness in that investigation; or that Graham, by participating in the assault of Aspilaire, intended to obstruct that investigation. *See* Def's Mem. in Supp. at 4–5.

*Section 1503*

Although the allegations and evidence as to this charge are detailed below with respect to the sufficiency of the evidence, for purposes of this argument the pertinent allegations are as follows. In October 2019, John Aspilaire had been identified as a witness in a federal investigation of the 960 street gang, which investigation encompassed acts of violence, to include murder, committed by 960 gang members. Tahjay Love was a subject of one such homicide investigation. On October 19, 2019, allegedly to obstruct the investigation, Love and Graham violently assaulted Aspilaire, who was housed in the same prison facility as Love and Graham.

Graham's motion requires this Court to navigate the import of three cases previously decided by the Court of Appeals, two of which pronounced sweeping limitations on the applicability of § 1503 to conduct which also fell within the scope of § 1512, the prohibition against witness tampering, and a third, which subsequently confined the first two cases to the specific facts upon which each was decided. The first case is *United States v. Hernandez,* 730 F.2d 895 (2d Cir.

---

advanced by the Government here, *see United States v. Fortunato*, 2003 WL 21056974 (E.D.N.Y. March 10, 2023) and *United States v. Sampson*, 2016 WL 756565 (E.D.N.Y. Feb. 26, 2016), when the issue was raised at the Court of Appeals, the Court declined to address it, instead finding, on the merits, that the conduct at issue was proscribed by § 1503(a). *United States v. Sampson*, 898 F.3d 287, 298 (2d. Cir. 2018). The district court in *Sampson* issued a detailed and comprehensive analysis regarding the impact of the 2015 amendments to Fed. R. Crim. P. Rule 12 and concluded that a claim that an indictment failed to charge a crime must be raised prior to trial or is waived. *Id.* at \*9. While the Court considers the district court decision persuasive, given the Circuit's determination not to decide the issue, this Court proceeds directly to the merits of the claim.

1984); the second is *United States v. Masterpol,* 940 F.2d 760 (2d Cir. 1991), and third is *United States v. Sampson,* 898 F. 3d 287 (2018).

In *Hernandez,* the defendant was convicted after trial of, *inter alia*, obstruction of justice under § 1503. *Hernandez,* 730 F.2d at 897. There, while the defendant owned and operated a grocery store in New York City, he turned over stolen and/or forged government checks to his wholesalers as payment for goods. *Id.* "When the wholesalers' banks learned that some of these checks had been stolen, they returned them to the wholesalers who, in turn, demanded reimbursement from" the defendant. *Id.* Eventually, the defendant was forced to sell his business to one of his largest creditors, Rafael Gomez, who had accepted approximately $20,000 in stolen checks from the defendant and/or the defendant's wife. *Id.* The defendant was arrested after the sale of his business had been consummated. Thereafter, he returned to the store demanding that Gomez give him the dishonored stolen checks that Gomez had received from his bank. Instead, Gomez turned them over to the federal prosecutor. When the defendant again demanded their return, Gomez told him that he had provided whatever checks he had to the government. An argument ensued and the defendant told Gomez that if he did not produce the checks that night, the defendant would kill him. The defendant left the store and did not return. *Id.*

The Court of Appeals agreed with the Defendant that "by enacting the Victim and Witness Protection Act of 1982, Congress intended that intimidation and harassment of witnesses should thenceforth be prosecuted under Section 1512 and no longer fall under Section 1503." *Id.* at 899. The Court did not identify any limitation on this sweeping pronouncement.

Seven years later, the Court of Appeals decided *Masterpol.* There, the defendant faced fraud charges arising out of his overcharging a customer in connection with a construction project. *Masterpol,* 940 F.2d at 761. At trial, two of the defendant's employees testified that their wages

5

were lower than the wages reported and charged to the victim customer. *Id.* The defendant was convicted but before sentencing, urged the two employees to write letters to the judge, recanting portions of the trial testimony and explaining that they had been, in one fashion or another, compensated by the defendant in the amount disclosed to the victim customer. *Id.* The witnesses capitulated and wrote the letters, both of which were submitted to the sentencing court.

For this conduct, the defendant was subsequently indicted and charged with, *inter alia,* obstruction of justice under § 1503. *Id.* at 762. On appeal, relying upon *Hernandez,* the defendant challenged the obstruction conviction. The Government sought to limit the reach of *Hernandez* by arguing that *Hernandez* involved a coercive attempt to influence a witness, while *Masterpol* involved noncoercive urging of a witness to make false statements. The Government argued that the residual clause of § 1503 applied to the defendant's conduct, *Hernandez* notwithstanding, and that following *Hernandez* would allow for such conduct to go unpunished. The Court of Appeals disagreed. Relying upon *Hernandez* as well as a 1988 Amendment to § 1512, the Court found "no reason at this juncture to retreat from the position we took in *Hernandez,* that 'congress affirmatively intended to remove witnesses entirely from the scope of Section 1503.'" *Id.* at 763 (quoting *Hernandez,* 730 F.2d at 898).

Twenty-Seven years later, this issue again reached the Court of Appeals in *Sampson.* There, the defendant, a lawyer, a political "powerhouse" and member of the New York State Senate borrowed $188,500 from Edul Ahmad so that the defendant could replace the funds he had embezzled from foreclosure escrow accounts before the authorities realized the funds were missing. *Sampson* 898 F.3d at 294–95. He did not, however, repay Ahmad as agreed and instead Ahmed convinced him to use his position in the New York State Senate to benefit Ahmad in a variety of ways. *Id.* at 295. Subsequently, federal law enforcement arrested Ahmad for mortgage

fraud. He was being prosecuted by the United States Attorney's Office (USAO) for the Eastern District of New York. *Id.* The defendant told Ahmad that he had a friend that worked at the USAO, and he offered to reach out to this friend to obtain information about the strength of the government's case to include the identity of trial witnesses. Ahmad accepted the offer to help him identify potential witnesses. *Id.*[5]

The defendant reached out to his friend at the USAO, Noel, who proceeded to provide the defendant with the names of witnesses and other non-public information he was able to access by virtue of his position. Noel also advised one of his supervisees to keep him apprised of developments in the Ahmad prosecution and another, in the public integrity unit, to let him know if any witnesses were speaking to law enforcement about the defendant. The defendant also undertook additional steps to monitor the Ahmad case, to glean inside information and to prevent others from cooperating with the Government. *Id* at 295–96.

The defendant was eventually convicted on multiple charges to include, as relevant here, obstruction of justice stemming from his efforts related to the USAO and the Ahmad mortgage fraud investigation and prosecution. *Id.* at 298. After trial, the district court rejected Sampson's argument that, because he was only seeking information with the corrupt intent of facilitating witness tampering, his conviction for obstruction of justice ran afoul of *Hernandez* and *Masterpol.* *Id.* On appeal, the Court of Appeals also rejected this argument and in doing so, "narrow[ed] the potential reach of some of our language in *Hernandez* and *Masterpol* – cases whose reasoning 'has been rejected by every other federal court of appeals that has considered the issue.'" *Id*. at 299 (quoting *United States v. Bruno,* 383 F.3d 65, 87 (2d Cir. 2004)).

Specifically, the Court held:

---

[5] The Government's theory was that the defendant was trying to keep Ahmad from cooperating with law enforcement as a means of protecting himself. *Id.*

"*Hernandez* and *Masterpol* involved intimidating and threatening a witness, and corruptly persuading witnesses to recant their testimony. We decline today to extend the reasoning of *Hernandez* and *Masterpol* **to bar any other sort of obstructive witness-related conduct from being prosecuted under § 1503**." *See, e.g.*, *Mar. Ins. Co. v. Emery Air Freight Corp.*, 983 F.2d 437, 440–41 (2d Cir. 1993) (Meskill, *C.J.*) (concluding that a prior decision of this Court, though not overruled, should be limited to its facts); *S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 193 (2d Cir. 1984) (similar). To whatever extent that language in either *Hernandez* or *Masterpol* might be read to stand for broader propositions about the propriety of prosecuting witness-related conduct under § 1503(a), we conclude that those statements are not binding. *See, e.g.*, *Ming Shi Xue v. Bd. of Immigration Appeals*, 439 F.3d 111, 121 (2d Cir. 2006) ("An opinion simply cannot hold more than the facts before it." (internal quotation marks omitted) (quoting *United States v. Garcia*, 413 F.3d 201, 232 n.2 (2d Cir. 2005) (Calabresi, *J.*, concurring) ) ).

*Id.* at 301 (emphasis added). The court first explained that under *Hernandez,* certain conduct that falls within the residual clause of § 1503, but outside the scope of § 1512, could escape prosecution. This would undermine Congress's intent in enacting the Victim Witness Protection Act, which was to increase protection for witnesses. *Id.* at 301–302. The court then undertook a rather substantial critique of the court's reasoning in both *Hernandez* and *Masterpol.*[6]

At this juncture, the question then is whether the assault of John Aspilaire falls within the now narrowed holdings of *Hernandez* and *Masterpol*, or whether the facts are sufficiently different from either of those cases to bring this case within the holding of *Sampson.*

First, *Hernandez* involved threatening to harm a witness if he did not turn over certain documents/evidence. This is not that case. A violent assault on an unsuspecting witness is plainly an "other sort of obstructive witness-related conduct," which may be charged under § 1503. *Sampson,* 898 F.3d at 301. Similarly, in *Masterpol,* the defendant persuaded government witnesses

---

[6] The Court does not recite the details of this critique, as such an undertaking is not necessary to the dispositive inquiry of whether the conduct alleged here falls within the now narrowed holdings of *Hernandez* or *Masterpol.* But the intensity of the Court's disapproval of the prior decisions is viewed by this Court as a directive to read *Hernandez* and *Masterpol* as applying to factual scenarios that precisely mirror those present in those cases.

to recant their trial testimony via letter ahead of his sentencing. Those facts bear no resemblance to the conduct at issue here, the assault. Accordingly, the Court concludes that the conduct of physically assaulting a witness falls within the residual clause of Section 1503 and this prosecution, proceeding thereunder, is not prohibited by *Hernandez* or *Masterpol.* The motions for judgment of acquittal on this basis are therefore DENIED.

*Sufficiency of the Evidence*

The defendant next argues that the evidence was insufficient to establish that Graham was aware of the federal investigation or that Graham was aware that Aspilaire was a witness in that investigation, as motivating the assault. *See* Def.'s Mem. in Supp. at 4–5; Def.'s Reply at 5–6. The Government argues that drawing all reasonable inferences in favor of sustaining the jury's verdict defeats this argument. The Court agrees with the Government.

As charged to the jury, the Government was required to prove the following:

1. That there was a proceeding pending before a federal grand jury;

2. That the defendant knew of the pending judicial proceeding;

3. That the defendant used physical force, as charged in the indictment; and

4. That the defendant's conduct endeavored to influence, obstruct, or impede the due administration of justice in that proceeding.

Jury Instr., ECF No. 687, at 48. The Defendant challenges the sufficiency of the evidence as it relates to the second and fourth elements—the requisite *mens rea* of knowledge and intent. Def.'s Mem. in Supp. at 4–5. Much of the evidence on the events at issue was not disputed. Indeed, the assault itself was captured on surveillance video at the correctional facility at which it occurred. *See* Gov. Ex. 1003. What is in dispute is whether the evidence allows for an inference that the Defendant both knew of and intended to obstruct the grand jury proceedings.

The evidence, viewed in the light most favorable to sustaining the verdict established the

following. In late 2017, in response to a spate of violence in the city, the Federal Bureau of Investigation began working with the Waterbury Police Department (WPD) in a joint investigation into, among others, the 960 gang in Waterbury. *See* Jan. 10 Trial Tr., Pt. 2, ECF No. 704, at 27:5–29:3. A federal grand jury was convened for the purposes of the investigation. *See id.* at 44:21–45:6; Jan. 31 Trial Tr., PM, ECF No. 732, at 8:10–8:12.

Zaekwon McDaniel, a member of 960, was a very close associate and friend of the Defendant.[7] Members of 960 knew the Defendant as a close associate of McDaniel and knew his nickname to be Lil Cuz. *See* Jan. 18 Trial Tr., AM, ECF No. 713, at 123:16–124:17. By the beginning of 2018, 960 members were aware of the federal investigation. McDaniel even performed in a rap video entitled "Feds Watching," the contents of which appeared to directly reference the ongoing investigation. *See* Gov. Exs. 44A, 44B.

Tahjay Love was also a member of 960 and an associate of the Defendant. Jan. 18 Trial Tr., AM, at 115:7–116:6; Jan. 31 Trial Tr., PM, at 22:15–24:6; Gov. Ex. 1017.

Department of Correction personnel monitor gang activity and phone calls by and between gang members. Officer Peracchio, who was tasked with monitoring 960 members, began also monitoring the Defendant due to the frequency with which McDaniel and the Defendant communicated. Jan. 31 Trial Tr., AM, ECF No. 731, at 115:22–116:10.

Department of Correction personnel seized a document from Love's cell that included a list of nicknames for 960 members. *See* Jan. 30 Trial Tr., PM, ECF No. 730, at 22:18–27:17. It included the Defendant, a.k.a. "Lil Cuz." *See* Gov. Ex. 1017; Jan. 31 Trial Tr., PM, at 22:15–23:21.

McDaniel and Love came under investigation for the murders of Clarence Lewis and Antonio Santos, which occurred at a Wendy's in November 2017. Jan. 8 Trial Tr., AM, ECF No.

---

[7] The evidence included that McDaniel provided a 960 gun to the Defendant in 2017. Jan. 19 Trial Tr., ECF No. 715, at 77:15–78:16.

700, at 104:17–109:14.

Aspilaire and Love were cellmates from April 3, 2018, through May 8, 2018. *See* Gov. Ex. 1004. During that time, Love told Aspilaire that he was involved in the Wendy's murders. Jan. 26 Trial Tr., AM, ECF No. 724, at 69:15–72:10, 73:16–76:17, 82:22–83:17. Thereafter, Aspilaire was arrested in August of 2018. *Id.* at 108:25–109:9. At that time, he gave a statement to Detective Sanchez of the WPD that while they were cellmates, Love told him that Love was involved in the Wendy's murders. *Id.* at 82:22–84:3.

Aspilaire's statement to Det. Sanchez was included in an arrest warrant application and affidavit which was signed on October 12, 2018. *See* Gov. Ex. 1012B. Although Aspilaire was not identified by name in the Affidavit, his identity could be gleaned by someone familiar with the details of Love's statement, i.e. Love.[8]

On October 18, 2019, Aspilaire, again incarcerated, was transferred to MacDougall Correctional and placed in a cell adjacent to the cell in which Love and the Defendant were housed. *See* Jan. 26 Trial Tr., AM, at 84:4–85:24; Jan. 25 Trial Tr., ECF No. 722, at 69:16–70:14. On October 19, 2019, in the Defendant's presence, Love accused Aspilaire of talking about Love to law enforcement, i.e. "snitching." *See* Jan. 26 Trial Tr., AM, at 88:15–90:14.

Later that evening, Love and the Defendant, in a coordinated attack, violently assaulted Aspilaire calling him things such as "snitch-ass nigga" and stating "this what the f*** you get, shoulda never told," by reasonable inference, a reference to the Wendy's murders. *Id.* at 91:15–93:14; *see also* Gov. Ex. 1003. Indeed, when asked what "you shoulda never told" meant, Aspilaire responded "Basically, I shoulda never told, cooperated with the police about wit' the situation that happened." Jan. 26 Trial Tr., AM, 92:22–92:23. By this point in time, there is no question that the

---

[8] A copy of the Affidavit was seized from Love's prison cell in February 2020. While this seizure was after the assault, it evidences an ongoing interest in identifying cooperating witnesses. *See* Gov. Ex. 1012B

11

Wendy's murders were the known subject of a federal probe.

Aspilaire testified that 960 members believed that he was cooperating with the investigation into the 960 gang. *Id.* at 92:11–92:23, 98:22–99:3.

Further investigation revealed that both Graham and Love planned the attack, as each communicated to others outside the prison that they would be going, in essence but in code, to segregation, which is exactly what happened. *See* Gov. Exs. 1008, 1009A, 1009B. Following the assault, additional prison calls reveal that 960 members quickly learned of the assault and at the very least approved of it. *See* Gov. Exs. 1010A, 1011A.

The jury also heard substantial evidence and saw exhibits which revealed the 960 gang's efforts to identify cooperating witnesses as well as the potential for violence against those believed to be cooperating with law enforcement. *See, e.g.,* Gov. Ex. 1016A; Jan. 18 Trial Tr., PM, ECF No. 714, at 8:11–8:24, 49:11–49:16; 67:10–67:17; Jan. 19 Trial Tr., ECF No. 715, at 20:15–20:19. Indeed, the gang motto "No Face No Case" and the common practice of donning ski masks during acts of violence, would render a cooperating witness a significant threat to defeating a prosecution. Jan. 18 Trial Tr., PM, at 24:15–25:3.

The Court agrees with the Defendant that there is little direct evidence that the Defendant was told explicitly that a federal investigation into the 960 gang and its associates was underway. This does not, however, preclude the inference from the circumstantial evidence that he had such knowledge, and that his conduct in assaulting Aspilaire was motivated, at least in part, to dissuade Aspilaire and perhaps others, from cooperating with law enforcement in that investigation. The assault itself and the statements made during the assault by both Love and the Defendant permit, perhaps require, the inference that the assault was an effort to silence Aspilaire (or perhaps others given the manner by which news of the assault travelled). Further, the fact that Aspilaire had

provided information about Love (and not some other 960 members); that Love was the individual with whom the Defendant planned and committed the assault; that the Defendant was present when Love accused Aspilaire of cooperating with law enforcement; that the Defendant was Love's cellmate; that Love identified the Defendant as a 960 associate; and that the existence of the federal investigation into 960 was well-known by October 2019 all collectively support the reasonable inference as to the Defendant's knowledge and intent in carrying out the attack on Aspilaire.

The motions for judgment of acquittal on this basis are therefore DENIED.

**Conclusion**

For the foregoing reasons, the Defendant's Motions for Judgment of Acquittal are DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of January 2025.

> _/s/ Kari A. Dooley_
> KARI A. DOOLEY
> UNITED STATES DISTRICT JUDGE